**United States District Court**
For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8    SHAWNA WILKINS-JONES,                      No. C-08-1485 EMC

9              Plaintiff,                       **ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANTS'**
10        v.                                    **MOTION TO DISMISS**

11   COUNTY OF ALAMEDA, *et al.*,               **(Docket No. 216)**

12             Defendants.
     _____/

13

14

15                        I.    __INTRODUCTION__

16        Shawna Wilkins-Jones filed suit against the County of Alameda ("County") on March 18,

17   2008, for violations of the California Disabled Persons Act ("CDPA") and the Americans with

18   Disabilities Act ("ADA").  She alleged that she was denied access to jail policies and facilities for

19   disabled persons when she was arrested and detained on April 13, 2007, for six days.  Compl. ¶¶ 1-2.

20   The Court granted summary judgment in favor the County as to all of Plaintiff's claims. *See* Docket

21   Nos. 169, 204.  However, the Court granted Plaintiff leave to amend to add Defendants Prison

22   Health Services (now known as Corizon), a for-profit business contracting with the County to

23   provide medical services to inmates, and its employees Melissa Brown, Martha Campos, and Bill

24   Wilson.  Docket No. 204.

25        Plaintiff's First Amended Complaint now brings claims against Defendants under the ADA,

26   CDPA, and the Unruh Civil Rights Act.  Docket No. 206.  Defendants' motion to dismiss the FAC is

27   pending before the Court.  Docket No. 216.  After considering the parties' submissions and oral

28

United States District Court

For the Northern District of California

1  argument, and for the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN**

2  **PART** Defendants' motion to dismiss.

3  ## II.   FACTUAL & PROCEDURAL BACKGROUND

4  Shawna Wilkins-Jones suffers from systemic lupus and rheumatoid arthritis.  FAC ¶ 2.  She

5  has had hip and knee replacements, and rheumatoid arthritis has left her hands deformed.  *Id*. ¶ 25.

6  She has limited mobility as a result of her disabilities.  *Id*. ¶ 9.  Her doctor describes her as "semi-

7  ambulatory."  Docket No. 134, ¶ 16.  She takes several medications to manage her symptoms. FAC

8  ¶¶2, 25.

9  Plaintiff was arrested on April 13, 2007, on the basis of a four-year-old misdemeanor

10  warrant.  *Id*. ¶ 2.  Police took her to Santa Rita Jail because it was the only disability-accessible

11  facility.  *Id*.  Plaintiff notified Defendants and jail staff of her disabilities repeatedly during her time

12  at Santa Rita.  *Id*.  However, despite noting that she "would have difficulty with handrails and stairs"

13  and that her hands were deformed, Defendants failed to provide her with any accommodations for

14  her disabilities.  *Id*.  ¶¶ 2, 25.  Plaintiff alleges that Defendants failed to take into account the

15  mitigating effects of her medication in assessing her disability, and therefore failed to properly

16  classify her as someone in need of accommodation. *Id*. ¶ 23.  Defendants also failed to properly

17  complete their own procedures by, *e.g.*, leaving certain form questions blank such as, "is the

18  inmate's mobility restricted in any way?"  *Id*. ¶ 24.

19  Defendant PHS/Corizon is a private corporation that contracts with the County to provide

20  assessments of incoming prisoners and medical care to inmates at Santa Rita Jail.  Its employees,

21  including Defendants Brown, Campos, and Wilson, are responsible "for establishing and enforcing

22  policies regarding the processing of inmates being brought into the jail, classification and housing

23  needs of inmates as well as identification and treatment of inmates with disabilities, including

24  provision of reasonable accommodations." *Id*. ¶ 11.  Defendant Brown, a nurse, performed

25  Plaintiff's intake assessment.  Defendant Campos supervised the nursing staff. *Id*. ¶ 13.  Defendant

26  Wilson is the PHS/Corizon Health Services Administrator, responsible for setting policies regarding

27  the identification and treatment of persons with disabilities.  *Id*.  Plaintiff has named other

28  employees as Does because she does not know their identities.

As a result of Defendants' evaluation and recommendations to the County, Plaintiff was forced to stay in an inaccessible holding cell for three days, where she "had to stand for hours at a time, sleep on a cement floor, and painfully hold her excretory bodily functions." *Id*. ¶ 2.  She was later transferred to other housing and holding cells, also inaccessible, where she continued to have trouble accessing the toilets, showers, and other facilities.  *Id*. ¶¶ 2, 37.  "She was forced to stand for long periods at a time, forced to walk long distances within the jail and to the Glenn Dyer Detention Facility and Wiley Manuel Court House, and prevented from sitting or lying down, causing her great pain and discomfort."  *Id*.  Specifically, Plaintiff suffered from "circulatory problems that led to major pain and swelling in her joints, swelling in her legs that became so bad that her skin broke into deep cysts that would not heal, back pain and injury, dehydration, headaches, nausea, and injury to her excretory system." *Id*.

Plaintiff alleges that Defendants, through their policies and practices, discriminated against her on the basis of her disabilities.  She alleges that they acted in violation of the California Disabled Persons Act, Cal. Civ. Code § 54; the Unruh Civil Rights Act, Cal. Civ. Code §§ 51 and 52; and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131.  Plaintiff seeks damages, fees, and costs.

Plaintiff originally filed her complaint against the County, but the Court per Judge Patel granted two summary judgment motions in favor of the County resolving all of Plaintiff's claims. Docket No. 169, 204.  Plaintiff then amended her complaint (with the Court's permission) to allege similar claims against the current Defendants.  Docket No. 206.  Defendants now move to dismiss these claims.  Docket No. 216.

## III.   DISCUSSION

A.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged.  *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the

1   nonmoving party, although "conclusory allegations of law and unwarranted inferences are

2   insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir.

3   2009). While "a complaint need not contain detailed factual allegations ... it must plead 'enough

4   facts to state a claim to relief that is plausible on its face.' " *Id.* "A claim has facial plausibility

5   when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

6   the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937,

7   1949 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility

8   standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a

9   defendant acted unlawfully." *Id.*

10  B.      Statute of Limitations

11          Defendants state that they plan to file a motion for reconsideration of this Court's prior ruling

12  that Plaintiff's claims related back to her original complaint. *See* Mot. at 2; Order of August 19,

13  2011, Docket No. 204, at 13-20. However, Defendants have not actually filed such a motion, nor do

14  they make any argument as to why the Court should reconsider its prior order. Accordingly, the

15  Court declines to address any issue related to the statute of limitations as it has not been properly

16  raised.

17  C.      Title II – ADA

18          Title II of the ADA states: "No qualified individual with a disability shall, by reason, of such

19  disability, be excluded from participation in or be denied benefits of the services, programs, or

20  activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §

21  12132. The ADA's proscription against such discrimination was modeled after Section 504 of the

22  Rehabilitation Act which states: "No otherwise qualified individual with a disability . . . shall, solely

23  by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or

24  be subjected to discrimination under any program or activity receiving Federal financial assistance."

25  29 U.S.C. § 794(a). However, Title II applies to public entities whereas Section 504 applies to

26  recipient of federal funds.

27          An ADA violation is established where a plaintiff proves that: "(1) he is a 'qualified

28  individual with a disability'; (2) he was either excluded from participation in or denied the benefits

4

United States District Court

For the Northern District of California

1  of a public entity's services, programs, or activities, or was otherwise discriminated against by the

2  public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his

3  disability." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001) (citing *Weinreich v.*

4  *Los Angeles County Metropolitan Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)).  In a disability

5  action seeking monetary relief, a plaintiff must additionally prove intentional discrimination as

6  defined by the "deliberate indifference" standard.  *Duvall*, 260 F.3d at 1138.  "Deliberate

7  indifference requires both knowledge that a harm to a federally protected right is substantially likely,

8  and a failure to act upon that likelihood."  *Id.* at 1139 (citing *City of Canton v. Harris*, 489 U.S. 378,

9  389 (1988)).

10  Defendants argue that Plaintiff fails to state a claim under Title II of the ADA because (1)

11  Defendant PHS/Corizon is not a public entity; (2) Title II does not permit claims against individual

12  defendants; (3) Judge Patel has already ruled that Defendants did not act with deliberate

13  indifference; and (4) deficient medical care cannot give rise to an ADA claim.  I will address each in

14  turn.

15  1.  Public Entities

16  Defendants argue that Plaintiff's Title II claim fails because PHS/Corizon is not a public

17  entity.  Title II provides for liability only against public entities, which it defines as: "(A) any State

18  or local government; (B) any department, agency, special purpose district, or other instrumentality

19  of a State or States or local government; and (C) the National Railroad Passenger Corporation, and

20  any commuter authority…." 42 U.S.C. §12131.  On this issue, the parties' dispute centers solely on

21  whether Defendant Corizon can be considered an "instrumentality" of the state.

22  There is substantial disagreement among courts as to whether private companies can be held

23  liable under Title II when they perform contracted services for the government.  The Ninth Circuit

24  has not directly ruled on the question, although it has considered two somewhat related issues.  In

25  *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065-66 (9th Cir. 2010), the Ninth Circuit considered

26  whether an Attorney General regulation prohibiting public entities from "directly or through

27  contractual, licensing, or other arrangements, discriminat[ing] against individuals with disabilities"

28  was arbitrary, capricious, or manifestly contrary to the text of Title II.  The court found, "[t]hat a

United States District Court

For the Northern District of California

1   public entity has contracted for the provision or occurrence of such services, programs and activities

2   seems sufficient to make them 'the services, programs, or activities' of that entity." *Id*. at 1066.

3         Thus, *Armstrong* resolves the converse of the question presented here, holding that public

4   entities may not contract away their liability by partnering with private entities to perform certain

5   services. This is consistent with the legislative and regulatory interpretation of the ADA. "[A]

6   public entity, in providing any aid, benefit, or service, may not, directly or through contractual,

7   licensing, or other arrangements, discriminate against individuals with disabilities.") 28 C.F.R. §

8   35.130(b)(1). *See* Department of Justice, The Americans with Disabilities Act: Title II Technical

9   Assistance Manual § II-1.3000 (1993) (describing a scenario in which a private restaurant operates

10  within a State park and stating that "[t]he State department of parks, a public entity, is subject to title

11  II. The parks department is obligated to ensure by contract that the restaurant is operated in a

12  manner that enables the parks department to meet its title II obligations, even though the restaurant

13  is not directly subject to title II."); *id.* (describing a contract between a city and a private corporation

14  to build a sports stadium, and stating that "the new stadium would have to be built in compliance

15  with the accessibility guidelines of both titles II and III. *In cases where the standards differ, the*

16  *stadium would have to meet the standard that provides the highest degree of access to individuals*

17  *with disabilities*.") (emphasis added). *See also* S. Rep. No. 101-116, at 45 (1989) ("Agencies of a

18  State, or a political subdivision of a State that provide school bus transportation are required to

19  provide bus service to children with disabilities equivalent to that provided to children without

20  disabilities (*whether provided directly or by contract or other arrangement with a private entity*)

21  (emphasis added); H. Rep. 101-482, pt. 2, at 86 (same).

22        However, that a public entity may not contract away its responsibility under the ADA does

23  not answer the converse question whether the private entity holding the contract may itself be liable

24  under Title II of the ADA.

25        In arguing that private entities may be liable under Title II, Plaintiff relies on *Jensen v. Lane*

26  *County*, 222 F.3d 570, 575-76 (9th Cir. 2000). In *Jensen*, the Ninth Circuit held that a private doctor

27  who contracted with the county to provide mental health evaluations was a state actor for § 1983

28  purposes. The court found that "Dr. Robbins and the County through its employees have undertaken

1   a complex and deeply intertwined process of evaluating and detaining individuals who are believed

2   to be mentally ill and a danger to themselves or others." *Id*. at 575.  It therefore concluded that "the

3   state has so deeply insinuated itself into this process that there is a sufficiently close nexus between

4   the State and the challenged action of the [defendant] so that the action of the latter may be fairly

5   treated as that of the State itself." *Id*. (internal citations and quotation marks omitted).

6         However, *Jensen* did not consider the question of whether a party who is a "state actor" for §

7   1983 purposes is also an "instrumentality" of the public entity under other statutory provisions, such

8   as Title II.  As Defendants point out, the ADA does not use the language of state action or the words

9   "under color of law" as appears in § 1983.  Instead, the ADA defines "public entities" to which Title

10   II applies in more specific terms.

11         Cases which have directly addressed the question at bar have split on the issue.  The majority

12   of courts – including the only circuit courts to have reached the question – have held that Title II

13   does not apply to government contractors.  These courts have employed standard canons of statutory

14   construction to conclude that an "instrumentality" of the government must be an entity that is either

15   part of or created by the government itself.  In *Edison v. Douberly*, 604 F.3d 1307, 1309-10 (11th

16   Cir. 2010) the Eleventh Circuit held that a private prison management company was not an

17   "instrumentality of the state" under Title II based on the *noscitur a sociis*[1] canon, as all other words

18   defining public entity in the statute referred to governmental units.  The *Edison* court concluded that

19   "[e]ven where such a private entity contracts with a government to perform a traditional and

20   essential government function, it remains a private company, not a public entity." *Edison*, 604 F.3d

21   at 1310 (citing *Green v. New York*, 465 F.3d 65, 79 (2d Cir. 2006)).  In *Green v. City of New York*,

22   465 F.3d 65, 79 & n. 10 (2nd Cir. 2006), the Second Circuit held that a private hospital performing

23   services through a contract with the City is not an instrumentality of the state under Title II because

24   "'instrumentality' is [] best read as referring to a creature of a state or municipality." *See Cox v.

25   Jackson*, 579 F. Supp. 2d 831, 852 (E.D. Mich. 2008) (considering claim against a private medical

26   provider for a prison and finding that "[a] private contractor does not become a 'public entity' under

27   Title II merely b[y] contracting with a governmental entity to provide governmental services").

---

28       [1]  "[A] word is known by the company it keeps." *Id*. at 1309.

United States District Court

For the Northern District of California

1       The courts that reject this view focus on courts' duty to construe the ADA liberally and

2   distinguish between mere *contracting* with the government, on the one hand, and taking on

3   government *functions*, on the other.  For example, Judge Barkett's dissent in *Edison* reasoned that a

4   private company cannot be considered a public entity merely by virtue of contracting with the

5   government to provide services; however, where the private company contracts to provide essential

6   government functions, functions which only governments are allowed to perform, that company

7   becomes a public entity for liability purposes.  Thus, she explained, "[u]nlike hospitals, which can

8   be operated on behalf of the government through a contractual agreement or can be operated

9   independently, prisons can *never* be operated independently of the government."  604 F.3d at 1311.

10   She therefore concluded that a private operator of a prison was necessarily an instrumentality of the

11   state for purposes of the ADA.  "[W]hen a company takes the place of the state in performing a

12   function within the exclusive province of the state, that company cannot be permitted to avoid the

13   requirements of the law governing that state function."  *Id.* at 1312.

14       Other courts have applied reasoning similar to Judge Barkett and found Prison Health

15   Services (as well as other similar entities) liable under Title II.  *See, e.g.*, *McNally v. Prison Health*

16   *Svcs.*, 46 F. Supp. 2d 49, 58 (D. Me. 1999) (treating claim against PHS under Title II as claim

17   against the prison and stating, "PHS's prescription service and the disposition of HIV-positive

18   prisoners' requests for their medication is a program or service of Cumberland County Jail") (citing

19   *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (finding that "transportation service to the

20   police station" was a service of the police within the meaning of the ADA, though not considering

21   private entity liability); *see also Hamlin v. Prison Health Services, Inc.*, 2004 WL 2980749, at *10

22   (D. Me. Dec. 22, 2004) (describing standard government contracting to, *e.g.*, perform catering

23   services in a national park, as "substantially different than contracting with the State to assume its

24   constitutional burden of providing for an inmate's basic human needs," but declining to reach the

25   question because plaintiff had failed to state a claim); *Gutierrez v. Valdez*, 2010 WL 529493 (D.

26   Idaho. Feb. 9, 2010) ("Liberally construed, the Complaint states an ADA and RA claim against [a

27

28

United States District Court

For the Northern District of California

1    private prison contractor].  The parties may brief at a later date whether in the Ninth Circuit, Title II

2    applies to private entities providing health services in prisons.").[2]

3          On balance, although the Court finds the rationale of Judge Barkett's dissent and the other

4    courts noted above somewhat persuasive, in the absence of Ninth Circuit authority, the Court defers

5    the currently prevailing view in the circuit courts that government contractors are not liable under

6    Title II.  In addition to *Edison*'s and *Green*'s textual analysis, discussed above, the structure of the

7    ADA arguably supports this view.  Although Title II focuses solely on public entities, Title III of the

8    ADA offers recourse against private entities.  *See* 42 U.S.C. §§ 12181-89. These parallel sections

9    impose different obligations.  For example, while parties may recover damages from public entities

10   under Title II, "[d]amages are not recoverable under Title III of the ADA-only injunctive relief is

11   available for violations of Title III."  *Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir. 2002) (citing 42

12   U.S.C. § 12188(a)(1) (providing that remedies under Title III are the same as those outlined in 42

13   U.S.C. § 2000a-3(A), which do not permit recovery of monetary damages).  It appears that Congress

14   created a statutory scheme that considers and arguably delimits the responsibility of private entities

15   under the ADA.  As Congress expressly addressed private entities in Title III, any inference that

16   Congress sought to impose liability for private entities under Title II should be based on a clearer

17   demonstration of legislative intent.  Plaintiff failed to make such a showing.

18         Moreover, the policy concern Judge Barkett identified – that entities otherwise subject to

19   Title II should not be able to escape liability merely by contracting with a private entity for the

20   performance of essential government function – is answered by the fact that as discussed above, the

21   public entity remains liable for the unlawful acts of its agent, even if that agent, a private entity, is

22   not itself liable under Title II.

23         Thus, even though a plaintiff does not have recourse under Title II directly against the

24   private entity, she still has recourse against the government when a private contractor violates the

25   ADA.  Indeed, in the instant case, Plaintiff sued the County and produced evidence of

26   PHS/Corizon's conduct as part of her case against the County.  *See Wilkins-Jones v. County of*

27

28        [2] Note that *Gutierrez* never presented the occasion for further briefing on the issue, as it was later dismissed for other reasons.

9

United States District Court

For the Northern District of California

1    *Alameda*, No. C 08-1485 MHP (Docket No. 169), 2010 WL 4780291, at *4-9 (N.D. Cal. Nov. 16,

2    2010) (considering evidence of PHS/Corizon employees' conduct along with County employees'

3    conduct in analysis of Plaintiff's Title II claim against the County); *see generally Duvall v. County*

4    *of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) (*respondeat superior* applies in Title II claims).

5    Plaintiff was not left without recourse under the ADA.  Here, she simply failed to prove her

6    substantive case against the County with sufficient evidence (which included conduct of

7    PHS/Corizon) to survive summary judgment on the merits.

8         Accordingly, absent a contrary indication from the Ninth Circuit, the Court concludes that

9    Title II does not apply to government contractors.  The Court therefore **GRANTS** Defendants'

10   motion to dismiss Plaintiff's claim under Title II of the ADA.  Because the Court concludes that

11   Defendant PHS/Corizon is not susceptible to a Title II claim, it declines to address Defendant's

12   remaining arguments regarding individual liability under Title II, the law-of-the-case doctrine, or

13   denial of medication.  The dismissal of the Title II claim is with prejudice.

14   D.    Unruh Act

15        Defendants next argue that Plaintiff has failed to state a claim under the Unruh Civil Rights

16   Act, which entitles plaintiff to "full and equal accommodations, advantages, facilities, privileges, or

17   services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).  "To

18   prevail on [a] disability discrimination claim under the Unruh Civil Rights Act, [a] plaintiff must

19   establish that (1) [s]he was denied the full and equal accommodations, advantages, facilities,

20   privileges, or services in a business establishment; (2) [her] disability was a motivating factor for

21   this denial; (3) defendants denied plaintiff the full and equal accommodations, advantages, facilities,

22   privileges, or services; and (4) defendants' wrongful conduct caused plaintiff to suffer injury,

23   damage, loss or harm."  *Johnson v. Beahm*, No. 2:11-cv-0294-MCE-JFM, 2011 WL 5508893, at *4

24   (E.D. Cal. Nov. 8, 2011) (citing California Civil Jury Instructions (BAJI), No. 7.92 (Spring 2009)).

25        The parties agree that the Unruh Act applies only to "business establishments."  Defendants

26   argue that this claim fails because prisons are not business establishments, and because Plaintiff has

27   failed to include factual allegations as to how she was denied full and equal accommodations or how

28   her disability was a motivating factor in her disparate treatment.

United States District Court

For the Northern District of California

1.     <u>Application to Defendants</u>

In passing the Unruh Act, the California Legislature intended to provide broad protection against arbitrary discrimination. *O'Connor v. Village Green Owners Assn.*, 33 Cal.3d 790, 795 (1983). Accordingly, "the term 'business establishments' [should be] used in the broadest sense possible." *Id*; *Munson v. Del Taco, Inc.*, 46 Cal.4th 661, 666 (2009) (quoting *Angelucci v. Century Supper Club*, 41 Cal.4th 160, 167 (2007) ("With regard to the Unruh Civil Rights Act particularly, we recently explained that it must be construed liberally in order to carry out its purpose to 'create and preserve a nondiscriminatory environment in California business establishments by 'banishing' or 'eradicating' arbitrary, invidious discrimination by such establishments.'"). In *O'Connor*, the California Supreme Court further determined the term "business" "embraces everything about which one can be employed, and it is often synonymous with calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain." *O'Connor*, 33 Cal.3d at 795 (1983) (internal quotations and citations omitted). By this definition, as Judge Patel has already held, the Unruh Act does not apply to correctional facilities per se. *See Taormina v. Cal. Dept. of Corrections*, 946 F. Supp. 829, 834 (S.D. Cal. 1996) ("According to [the *O'Connor* test], a prison does not qualify as a 'business' because prisoners are not engaged in a calling, occupation or trade for purposes of making a livelihood or gain. Rather, they are incarcerated by the state because of crimes which they have committed."). However, Judge Patel's prior ruling is not dispositive to the issue at bar as her holding only covered the Unruh Act's application to the County, which is not in dispute.

Whether the Unruh Act applies to a private business acting within a prison presents a different question. Defendants are a for-profit entity that charges the County for its services and therefore is engaged in an "overall function[] to protect and enhance . . . economic value." *O'Connor*, 33 Cal.3d at 795 (finding that a non-profit hospital was a business establishment because it charged its patrons substantial fees and finding that a condominium association was a business establishment because it exercised its powers and duties to enhance economic value). PHS/Corizon is thus qualitatively different from a correctional facility itself; while the County's operation of a jail may not be a business, PHS/Corizon is a business establishment operating for profit within a correctional facility. As the court in *Burks v. Poppy Const. Co.*, 57 Cal.2d 463, 468-69 (1962) held,

"The word 'establishment,' as broadly defined, includes not only a fixed location, such as the place where one is permanently fixed for residence or business, but also a permanent commercial force or organization or a permanent settled position (as in life or business)."  (Internal citations and quotation marks omitted.)

Indeed, a business need not be for-profit at all in order to be covered.  In *O'Connor*, for example, the court held that an owners association of a condominium development – "a nonprofit organization whose membership consists of all owners of units at Village Green" – was a business establishment.  33 Cal.3d at 793, 795-96.  The court noted that the original proposed version of the Act included not only "business establishments," but also "private or public groups, organizations, associations, business establishments, schools, and public facilities."  *Id*. at 795.  The court found that by deleting those examples and instead using the broad language, "all business establishments of every kind whatsoever," the Legislature intended "to include therein all formerly specified private and public groups or organizations that may reasonably be found to constitute business establishments of every type whatsoever."  *Id*. at 795-96.  Thus, the court held that any business or organization, whether for-profit, or non-profit, may be deemed a "business establishment" if it performs "customary business functions" and fulfills a "businesslike purpose."  *Id*. at 796.

PHS/Corizon does not dispute that it is a private, for-profit entity that functions as a business within County jails, whereby it is paid to provide services to inmates.  By providing services for a fee, PHS/Corizon performs a "customary business function," through which it serves inmates like Plaintiff.  That customary business function renders it a "business establishment" under the broad terms of the Unruh Act.

The fact that PHS/Corizon receives its profits from the County, not directly from the inmates it serves, does not defeat the Act's application.  As the Ninth Circuit has acknowledged, California courts "have allowed parties that are not 'clients, patrons or customers' in the traditional sense to bring Unruh Act claims," so long as the claimant is a "recipient[] of the business establishment's . . . goods, services or facilities."  *See Strother v. Southern California Permanente Medical Group*, 79 F.3d 859, 873 (9th Cir. 1996) (quoting *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal.3d 72, 83 & n.12 (1985)).  *Strother* included among these non-traditional "customers" covered under the Act

United States District Court

For the Northern District of California

1  individual members or club chapters of a club or organization challenging the organization's

2  policies, as well as a person accompanying a customer into a business where the business

3  discriminated against the accompanying person rather than its customer. *Id.* at 873-74 (citing

4  *Isbister*, 40 Cal.3d at 83; *O'Connor*, 33 Cal.3d at 790; *Jackson v. Superior Court*, 30 Cal.App.4th

5  936, 941 (1994); *Rotary Club of Duarte v. Board of Directors*, 178 Cal.App.3d 1035, 1059 (1986)).

6      Accordingly, the Court concludes that the Unruh Act covers Defendant PHS/Corizon.

7      2.    Deprivation of Full and Equal Accommodations, Facilities, or Services

8      Defendants next claim that Plaintiff has failed to allege a denial of full and equal

9  accommodations, facilities, or services. However, the Court rejects this argument, as Plaintiff's

10 FAC is replete with facts as to her difficulties accessing the jail's facilities, such as the beds, toilets,

11 showers, walkways, benches, etc., as a result of Defendants' actions. *See, e.g.*, FAC ¶¶ 29, 32. For

12 example, she alleges that "she was unable to use the toilet as needed . . . , causing her bodily

13 functions distress, pain and injuries." FAC ¶ 29. Defendants controlled her access (or lack thereof)

14 to certain services offered by Defendants and the County for incarcerated persons. *See, e.g.*, FAC ¶

15 57 ("Once an inmate was designated able-bodied or disabled, Sheriff's staff did not question the

16 designation, and followed the directions of PHS staff regarding whether or which accommodations

17 would be provided. The County also delegated to PHS the authority to set policies and make medical

18 assessments and recommendations which affected or determined whether the jail's disability access

19 policies applied to a given inmate, how and where the inmate was to be housed, and which

20 accommodations for disability, if any, an inmate would receive."). Plaintiff's allegations are

21 sufficient to allege a denial of full and equal access under the Unruh Act. *See, e.g.*, *Botosan v. Paul*

22 *McNally Realty*, 216 F.3d 827, 834-35 (9th Cir. 2000) (plaintiff need not show that it was *impossible*

23 to access the facility or service at issue in order to recover under the Act); *Koire v. Metro Car Wash*,

24 40 Cal.3d 24, 29 (1985) ("The Legislature's choice of terms evidences concern not only with access

25 to business establishments, but with equal treatment of patrons in all aspects of the business.").

26      3.    Motivating Factor

27      Defendants next argue Plaintiff has failed to allege that her disability was a motivating factor

28 in her denial of access. Mot. at 8 (citing CACI 3020 (California jury instructions requiring a

13

United States District Court

For the Northern District of California

1   plaintiff to demonstrate that a defendant's perception of her disability was a "motivating reason" for

2   the defendant's conduct)).  Defendants cite to CACI 3020; however, CACI's commentary admits

3   that while the Unruh Act jury instruction "uses the standard of 'a motivating reason,'" "[t]he

4   causation standard is still an open issue under this statute."  Indeed, the California Supreme Court

5   has explicitly held that a plaintiff may state an Unruh Act claim under § 51(f) based on an ADA

6   claim, without demonstrating intentional discrimination.  *See Munson v. Del Taco, Inc.*, 46 Cal.4th

7   661, 665 (2009) ("A plaintiff who establishes a violation of the ADA . . . need not prove intentional

8   discrimination in order to obtain damages under section 52.").  In an unpublished disposition, the

9   Ninth Circuit reversed a jury verdict based on a jury instruction using the "motivating factor"

10  standard because it failed to account for *Munson*.  *See Jankey v. Los Burritos, Inc.*, 343 Fed. Appx.

11  262, 264 (9th Cir. 2009).[3]  Other courts have likewise held that once a plaintiff has stated an ADA

12  claim, no showing of intent is required.  *See, e.g.*, *Johnson v. Ona*, No. 2:11-cv-0021-KJM-JFM,

13  2011 WL 5508872, at*2 (E.D. Cal. Nov. 8, 2011) (citing California Civil Jury Instructions (BAJI),

14  No. 7.92 (Spring 2009), for motivating factor standard, but stating that "[a] plaintiff who establishes

15  a violation of the ADA need not prove intentional discrimination under the Unruh Act").  Thus, to

16  the extent Plaintiff seeks to raise her Unruh Act claim through an ADA violation, she need not plead

17  intentional discrimination.  However, for the reasons stated above, Plaintiff failed to state a Title II

18  claim.  Nor has she expressly alleged a Title III claim.  *See* FAC ¶¶ 47-54; 55-62.

19          To the extent Plaintiff seeks to make an Unruh Act claim separate from an ADA claim, she

20  must allege intentional discrimination.  *See Earll v. eBay, Inc.*, No. 5:11-cv-00262-JF (HRL), 2011

21  WL 3955485, at *3 (N.D. Cal. Sept. 7, 2011) ("A violation of the Unruh Act may be maintained

22  independent of an ADA claim where a plaintiff pleads 'intentional discrimination in public

23  accommodations in violation of the terms of the Act.'") (quoting *Munson*, 46 Cal.4th at 668 (quoting

24  *Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 1175 (1991)).  In *Earll*, the court found

25  that plaintiff had failed to allege intentional discrimination because her allegations did "not

26  reasonably imply that eBay was unwilling or unable to remedy [her problems accessing parts of their

27  system as a deaf person]."  *Id*. at *4.  Although the plaintiff in *Earll* had alleged that eBay had "gone

28
─────────────────────
          [3]  Although *Jankey* is not binding precedent, the Court finds its reasoning persuasive.

United States District Court

For the Northern District of California

out of its way to design a system that deaf and hard of hearing persons cannot use," and had failed to correct its system despite her "multiple instances of one-on-one contact with eBay," the court found that such allegations were offset by admissions that in some of the plaintiff's communications with eBay, she had received information as to alternative ways she could access the system. *Id.* at *3. Thus, the court held that her allegations did not create a reasonable inference of *intentional* discrimination by eBay. *Id.* at *4. In *C.B. v. Sonora School Dist.*, 691 F. Supp. 2d 1123, 1155 (E.D. Cal. 2009), the court found that "allegations that District Defendants knew of Plaintiff's disability, knew how to handle it . . . , yet threatened Plaintiff with police intervention and caused the police to forcibly remove Plaintiff from the school grounds," were insufficient to allege intentional discrimination because, despite the plaintiff's conclusory allegations of malicious conduct, there was no reasonable indication that the defendants' "conduct was undertaken to discriminate against Plaintiff *because of* his disabilities." *Id.* (emphasis added). Similarly, courts have held that where a defendant's policy or practice merely has a discriminatory impact, it does not give rise to an Unruh Act claim absent allegations that the policy was a pretext for discriminatory intent or applied an a discriminatory manner. *See Koebke v. Bernardo Heights Country Club*, 36 Cal.4th 824, 854-55 (2005) (stating that it would be a violation of the Act to intentionally apply a facially neutral spousal benefit policy unequally based on sexual orientation); *Turner v. Ass'n of Am. Medical Colleges*, 167 Cal.App.4th 1401, 1411 (2008) (finding no Unruh Act claim independent of ADA where "plaintiffs have neither alleged nor proven that [defendant administering standardized test] was motivated by an animus toward those with learning and reading-related disabilities or granted accommodation to other groups or disabled individuals that it did not grant to those with learning and reading-related disabilities").

In the instant case Plaintiff alleges, *inter alia*, that Defendants specifically noted certain of her disabilities (*e.g.*, deformed hands, difficulty with handrails and climbing stairs) and yet failed to accommodate her. *See* FAC ¶ 25; *see also* FAC ¶ 3 ("[D]efendants knew and failed to properly act on the knowledge that Ms. Wilkins-Jones was a person with a disability who required assistive devices, accessible facilities, and preventive medication."). She further alleges that Defendants' policies failed to adequately provide for full assessment of a person's disabilities, such as those

15

United States District Court
For the Northern District of California

1    disabilities which are not immediately apparent or those which are mitigated by medication.  FAC ¶

2    23.  However, she also alleges that Defendants provided certain limited (and she alleges, inadequate)

3    accommodations; for example, an extra blanket and extra mattress.  FAC ¶ 11.  Defendants also

4    specifically noted that Plaintiff would have trouble with, *e.g.*, handrails and stairs,  and "assigned

5    [her] to a lower housing unit and a lower bunk within the housing unit, so that she would not have to

6    climb stairs."  FAC ¶¶ 23, 34.  That Defendants provided some, but not all, accommodations to

7    Plaintiff tends to negate an inference that Defendants' conduct was purposefully discriminatory.

8    Moreover, Plaintiff has not clearly alleged that she directly asked PHS/Corizon staff for any

9    particular accommodation which was refused or that her disabilities warranting such additional

10   accommodations were obvious and should have been known by PHS/Corizon.  Rather, she merely

11   alleges that Defendants did not fully and timely comply with, *e.g.*, her requests for medication (some

12   were provided), and that County employees (not PHS/Corizon employees) refused her requests for a

13   wheelchair based on the inadequate assessments performed by Defendants.  *See* FAC ¶¶ 30-32.

14   These are insufficient to reasonably infer discriminatory intent on the part of PHS/Corizon.  *Cf.*

15   *Earll*, 2011 WL 3955485 at *3-4; *Heinemann v. Copperhill Apartments*, No. CIV.

16   07-0018-FCD-DAD, 2007 WL 4249842, at *4 (E.D. Cal. Nov. 30, 2007) (finding allegations

17   sufficient to show intentional discrimination where plaintiff alleged defendants had invented a false

18   reason for moving the handicapped parking spaces and also refused to move them after plaintiff

19   confronted them about the lie and informed them that the new location would be dangerous).

20          Thus, Plaintiff's complaint falls short of alleging the "willful, affirmative misconduct"

21   required to state an Unruh Act claim separate from an ADA claim.  *Koebke*, 36 Cal.4th at 853.

22          Accordingly, the Court **GRANTS** Defendants' motion to dismiss the Unruh Act claim.  To

23   the extent the Unruh Act claim is independent of an ADA claim, dismissal is without prejudice.

24   That aspect of the claim which is dependent on Title II of the ADA is dismissed with prejudice.

25   E.     CDPA

26          Finally, Defendants argue that Plaintiff cannot state a claim under the CDPA.  The CDPA

27   provides that "[a]ny person or persons, firm or corporation who denies or interferes with admittance

28   to or enjoyment of [] public facilities . . . or otherwise interferes with the rights of an individual with

1    a disability under Sections 54 [right to streets, highways, and other public places], 54.1 [access to

2    places of public accommodation, housing, etc.] and 54.2 [service/guide dogs] is liable for . . .

3    damages . . . and attorney's fees." Cal. Civ. Code §54.3.  Intent is not a requirement in actions

4    involving money damages brought under the CDPA.  *See Donald v. Café Royale, Inc.*, 218 Cal.

5    App. 3d 168, 177 (1990) ("Viewing the statute reasonably and in a common sense fashion compels

6    the conclusion that no intent element is set forth."); *Lonberg v. City of Riverside*, 300 F. Supp. 2d

7    942 (C.D. Cal. 2004).

8         Defendants make two arguments against Plaintiff's CDPA claims.  First, they argue that the

9    CDPA does not apply to jails because they are not places "to which the general public is invited,"

10   Cal. Civ. Code § 54.1.  Second, they argue that Plaintiff has not alleged that she was denied access

11   to any particular place.  The Court addresses each contention in turn.

12        1.    Jail as Public Accommodation

13        Judge Patel has already addressed Defendants' argument that jails are not places of public

14   accommodation as described under the CDPA.  The Supreme Court has held that jails provide

15   "services, programs, [and] activities" within the meaning of the ADA.  *Yeskey*, 524 U.S. at 210.  She

16   found that because "the legislature intended the CDPA to provide, at a minimum, the same

17   protections that the ADA provides, it would be incongruous to this legislative intent to conclude that

18   the CDPA provides less protection to correctional facilities than the ADA."  Docket No. 169 at 15

19   (citing *Pa. Dep't. of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998) (holding that the ADA applies to

20   state correctional facilities).  Such a rationale applies equally to the current Defendants, as they

21   provide services within jails and, Plaintiff alleges, control inmates' access to various facilities,

22   programs, and services within those jails.

23        Defendants argue that the Court should not apply Judge Patel's conclusion to them because

24   she also reasoned that it would be inconsistent to apply the CDPA to the jail's public components

25   (*e.g.*, waiting rooms), but not its private components.  This rationale arguably does not apply to

26   PHS/Corizon because it operates only within the internal areas of the jail, rather than any external

27   areas.  However, Judge Patel based her conclusion on two independent grounds, one of which

28

United States District Court

For the Northern District of California

1  applies to Defendants as discussed above.  Thus, the fact that one ground is arguably inapplicable

2  does not render her ruling inapposite.

3        Defendants contend that "the California legislature intended to incorporate into the Unruh

4  Act and the DPA only those provisions of the ADA germane to the original scope of those state

5  laws." *Bass v. County of Butte*, 458 F.3d 978, 983 (9th Cir. 2006).  While this may be true, it is

6  reasonable to consider a jail a public place in the context of inmates' rights to be free from

7  discrimination on the basis of their disabilities.  While the general public is not permitted inside a

8  jail at any given time, the government has the power to compel members of the public to a jail under

9  certain circumstances.  A jail is therefore different from the example of a private association's

10  system of recreational trails Defendants cite in *Carolyn v. Orange Park Community Association*, for

11  which there was "no evidence in the record suggesting OPCA's trails were built for anyone other

12  than its own members"; rather, the only evidence in the record suggested that the "trails are an

13  'amenity' provided to OPCA's members in exchange for their membership and association dues, not

14  a public accommodation."  177 Cal.App.4th 1090, 1105 (2009); *see also id.* (finding that any site

15  that is "built by a private individual on private land solely for the personal enjoyment of the

16  individual and not opened to the public" is not a public accommodation).  The jail is more like

17  schools and hospitals contemplated under the ADA, which also restrict public access in certain times

18  and circumstances but are nonetheless "designed and intended to provide services, goods, privileges,

19  and advantages to members of the public."  *Id*. at 1104 & n.4.

20        It is not surprising therefore that other district courts have also considered CDPA claims

21  against jail facilities.  *See Lopez v. County of Tulare,* No. CV-F-11-1547-LJO-BAM, 2012 WL

22  33244, at *10 (E.D. Cal. Jan. 6, 2012); *Anderson v. County of Siskiyou*, No. C 10-01428 SBA, 2010

23  WL 3619821, at *6 (N.D. Cal. Sept. 13, 2010).[4]

24        Accordingly, the Court adopts and reaffirms Judge Patel's prior holding in this case that the

25  CDPA applies to jails and the accommodations and services provided therein.

26

27

28            [4]  These cases dismissed the claims for other reasons.

United States District Court

For the Northern District of California

2.      Denial or Interference with Access

Second, Defendants argue that Plaintiff fails to state a claim under the CDPA because she fails to allege that Defendants denied or interfered with her access to any particular place.  Mot. at 10.  The CDPA is concerned solely with *physical* access to public spaces.  "The DPA only guarantees physical access to a facility.")  *Lopez v. County of Tulare,* No. CV-F-11-1547-LJO-BAM, 2012 WL 33244, at *10 (E.D. Cal. Jan. 6, 2012).  *See Madden v. Del Taco, Inc.*, 150 Cal.App. 4th 294, 301 (2007) (Cal. Civ. Code § 54 "has always drawn meaning from a growing body of legislation intended to reduce or eliminate the physical impediments to participation of physically handicapped persons in community life, *i.e.*, the architectural barriers against access by the handicapped to buildings, facilities, and transportation systems used by the public at large") (internal quotation marks and citations omitted).  Thus, Plaintiff cannot maintain a claim based on the denial of services (as opposed to denial of physical access) under the CDPA.  *See Anderson v. County of Siskiyou*, No. C 10-01428 SBA, 2010 WL 3619821, at *6 (N.D. Cal. Sept. 13, 2010) (dismissing claim where it is "predicated upon the alleged denial of services, not the denial of access to a public facility").

Nonetheless, the FAC alleges denial of and/or interference with physical access.  Indeed, Judge Patel denied summary judgment as to the County on this question because she found that it was difficult to "determine, as a matter of law, the precise barriers that plaintiff encountered, nor conclude whether and the degree to which those barriers functioned to exclude her from or deny her the benefits of the County's detention programs.  Nor can the court determine as a matter of law whether such exclusion, denial of benefits, or discrimination was by reason of her disability."  Docket No. 169, at 19.[5]  As discussed above, Plaintiff alleges she could not access the toilets, walkways, and other portions of the jail because of her disability, including an accessible cell.  *See, e.g.*, FAC ¶ 29 (Plaintiff "was unable to use the toilet as needed over the next three days, causing her bodily functions distress, pain and injuries").  She also alleges that Defendants directly denied and interfered with her full access to those facilities, because they controlled the means by which she

---

[5]  This Court later granted summary judgment to the County on the basis of statutory immunity under California Government Code §§ 845.2 and 844.6.  *See* Docket No. 204, at 13.

United States District Court

For the Northern District of California

could attain such access.  *See Hankins v. El Torito Restaurants, Inc.*, 63 Cal. App. 4th 510, 520-24 (1998) (denial of access to accessible facilities when they are available can be cognizable under the CDPA, as the statute covers both "policy impediments" and "structural impediments").  As the *Hankins* court noted, the text of the statute contemplates other analogous types of interference with physical access by, *e.g.*, denying certain accommodations.  *See id.* at 523 (citing Cal. Civ. Code § 54.3(a) ("'Interfere,' for purposes of this section, includes, but is not limited to, preventing or causing the prevention of a guide dog, signal dog, or service dog from carrying out its functions in assisting a disabled person.").  Thus, at the 12(b)(6) stage, Plaintiff has stated a CDPA claim against Defendants.[6]

Defendants also claim they had no duty to ensure Plaintiff had access to the jail's facilities.  Mot. at 10-11.  However, the plain language of the statute imposes a duty not to deny or interfere with a person's access to public facilities.  Cal. Civ. Code § 54.3; *see also Turner v. Ass'n of Am. Medical Colleges*, 167 Cal.App.4th 1401, 1412 (2008) (noting that the CDPA would require an organization using a public facility to administer a standardized test to "guarantee [persons with disabilities] physical access to the place in which the test is administered").  Moreover, Plaintiff alleges that Defendants were responsible for ensuring her ability to access the jail's facilities, and that Defendants directly caused her to be denied access by failing to recommend accommodations for her.  *See, e.g.*, FAC ¶ 57 ("By contract, the County delegated to PHS the important function of intake assessment.  County Sheriff's staff deferred to PHS intake determinations.  Once an inmate was designated able-bodied or disabled, Sheriff's staff did not question the designation, and followed the directions of PHS staff regarding whether or which accommodations would be provided.  The County also delegated to PHS the authority to set policies and make medical assessments and recommendations which affected or determined whether the jail's disability access policies applied to a given inmate, how and where the inmate was to be housed, and which accommodations for disability, if any, an inmate would receive.").  Accordingly, the Court

---

[6]  To the extent Defendants argue that Plaintiff cannot state a CDPA claim merely because her Title II claim is dismissed, such an argument fails.  *See Nat'l Fed. of Blind v. Target Corp.*, 582 F. Supp. 2d 1185, 1207 (N.D. Cal. 2007) (rejecting the claim that "because Sexton has not suffered an injury under the ADA and has provided no evidence of a building code violation, his DPA claim must also fail").

concludes that Plaintiff has stated a claim under the CDPA, and Defendant's motion to dismiss is **DENIED**.

### IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is:  (1) **GRANTED** as to Plaintiff's Title II claim with prejudice; (2) **GRANTED** as to Plaintiff's Unruh Act claim with prejudice except that the aspect of the claim not based on Title II of the ADA is dismissed with leave to amend within 30 days from the date of this order; and (3) **DENIED** as to the CDPA claim.

This Order disposes of Docket No. 216.


IT IS SO ORDERED.


Dated:  March 14, 2012

_____
EDWARD M. CHEN
United States District Judge

**United States District Court**
For the Northern District of California